The next case on the calendar this morning is 17783 NRP Holdings v. City of Buffalo. Good morning, Your Honor. May it please the Court. Nelson Perel from the law firm of Webster Zani in Buffalo, New York, and we certainly admit responsibility for bringing these buffalo temperatures to New York City this morning. We did leave the snow at home this time. It snowed up there, but not down here, so we at least accomplished that much. I plan to focus my argument this morning on sort of three main points on this appeal, one being the contract-based claims that NRP has asserted against the City of Buffalo and the Buffalo Urban Renewal Agency. The second point I wish to address is the equal protection claim, and I would point out briefly that the Type 2 agreement claim and the equal protection claim were both dismissed on Rule 12 motions. So if there's any color to those claims, they should be reinstated and moved forward, and we think that's the case. The last issue that I would plan to address this morning is the legislative immunity defense, which was the basis for the district court's judgment dismissing the RICO claim against the individuals, which ended the RICO claim completely. And that was summary judgment, right? That was on summary judgment, but it was essentially, at least in our view, based on certainly a disputed factual record, and I think it was based on certain acts that the district court felt were significant, but there's a whole series of acts concerning the wrongful conduct in this case that should have been considered before simply dismissing the RICO claim based on legislative immunity. So I would just point out just a couple of things about NRP this court should be aware of. It's a nationally known company known for developing, building, and managing affordable housing projects, utilizing both federal and state funding. The primary source for federal funding is federal home funds, which are allocated by municipalities, and as well as state tax credits. And I think one of the things that's significant here is in 2009, after Mayor Brown no longer supported this project, he was approached by the Division of Housing and Community Renewal Commissioner, Deborah Van Amarangen. And one of the things that she had pointed out, which I thought was significant, is that NRP by that point, 2009, had built over 5,000 homes for families, of which 90% of them led to home ownership after the 15-year rent-to-own period, contrary to the stated reasons for why this project was killed. And I think the only other fact I'll mention before moving to these legal points is that this was a $12 million spend. And let's remember the timing here. This was in early 2009, at the time of the Great Recession, when business was not happening. And here you had a company coming into the city of Buffalo's east side, willing to engage in a $12 million project that would result in 50 single family and two family homes for very needy families. Since you're talking about background, let me ask you, you've made allegations of extortion. Did any criminal prosecution, state or federal, arise from the facts you have alleged? They have not, Your Honor. I probably should not go any further. I'm just looking to what's in the public record. Yeah. There have been press reports. I mean, there's been no prosecution filed. To what extent would that matter to your civil claims? I mean, supposing, and I may be asked the other side too, but supposing, entirely hypothetical, because I'm trying to understand the civil case, but entirely hypothetically supposing there was evidence of extortion, of a bribe, just supposing, not this mayor, some other mayor. Would that matter to your civil case, and if so, how? I would say, Your Honor, certainly if a federal criminal case produced that type of evidence, it would be extremely significant to our case on pretty much each of the claims that we've asserted. Certainly on the RICO claim, it would certainly provide useful evidence concerning RICO-type conduct. Extortion would be the basis for the RICO claim. So if that was established in a federal proceeding, it would be extremely useful in this case. Likewise, on the equal protection claim. I think if there was evidence developed that this project was killed due to- You've already said that your principal argument here, you're narrowing, you're focusing on RICO, and I think it's helpful for us then, for me then, to be thinking about RICO. You can go ahead. Yeah, I think the issue on RICO, relevant to this case, may be whether or not legislative immunity would apply, regardless of whether or not a criminal precedent- That's kind of what I guess I'm asking. Yeah. Would the charges or criminal charges in litigation, would that affect the legislative immunity? Yeah, it would affect the merits, but with respect to legislative immunity, I think this court or any court would still need to inquire whether or not the acts occurred within the legislative process, whether it was substantive or- It would be possible that this arises for criminal purposes out of a criminal act, at the same time it is nonetheless covered by legislative immunity for civil purposes. It would be possible, but I don't think that would be supported by the facts of this case. And it may be that in the course of the criminal case, the evidence developed with respect to the extortion would show what we think is important, which is that the acts that led to the killing of these projects occurred outside of the legislative process, for example. It would involve meetings that took place between Mayor Brown and Reverend Stenhouse when the decision was made that he will no longer support the project. That is the first act that resulted in the killing of this project. If that emerges in the criminal case, that would be supportive of our argument that legislative immunity would not apply, because that is not an act within the legislative process. Likewise, as the facts emerged after that meeting, when Mayor Brown met with- introduce a resolution authorizing all the related contracts, wouldn't you, to survive in the civil RICO context? That's not the case, Your Honor. I think that's because- and the reason for that, and that's sort of the position that's been argued by the other side, but there are a whole series of acts where that is the last act of a series of acts that resulted in the killing of this project. The mayor could have- as the chief executive, the mayor could have killed the project on his own. He could have decided that after the commitment letter was issued and the promises were made back in February 2008, any point along the way- remember, it was not until March of the following year or April of the following year where they got to the steps of introducing certain matters to the legislature. Any time in that continuum, the mayor could have gone to NRP and said, you know what? Yes, we made these promises to the project, but we no longer support it. And had he done it in that manner, the project would have been killed without any reference to a legislative process. And those are the facts of the case, and that's one of the reasons why legislative immunity should not apply in this case. But that means precisely we have to ask why he took the action or failed to take the action that was contemplated. He failed to introduce the resolution. It's precisely that kind of inquiry that signals the applicability of legislative immunity according to the analysis I've seen. Your Honor, I would agree that the law is very clear. Motive is irrelevant in considering whether or not legislative immunity should apply. The record was not sufficiently developed at this point to decide that legislative immunity applies. With respect to the issue of- there are two prongs to it under Rollin. With respect to whether or not the acts took place within a legislative process, I think the answer is clear that the record is not sufficiently developed. There were several depositions that were pending that were not allowed to go forward because of the timing of this. The court granted a stay of discovery so they could issue this summary judgment ruling. We had key depositions set up for Carla Kosmerl, who was integral throughout this one and a half year process. Can you give an example of the kind of testimony you would have hoped to get that would have illustrated why summary judgment was wrong? On legislative immunity and with respect to that issue, the facts will show. And we already had- there is facts in the record. It's not like that we're waiting for these depositions to take place. There are facts in the record that show that the mayor and the key fact is not the introduction of legislation. The key fact is the withdrawing of support. Once that support is withdrawn, the project is effectively killed and the entire investment is lost. What is the withdrawal of support? I thought we really focused on here that the mayor did not take the action of introducing the resolution for approval by the city council. And absent that, you can't have effective contracts under the Buffalo City Charter. Final agreement. But again, we're talking about the obligations under a type two preliminary agreement, which carries an obligation to proceed in good faith. I'll just point out the Goodstein case. That very same argument was made in the Goodstein case, which is the New York Court of Appeals case that we rely upon. The idea that approval of a final agreement required the action of an agency, and therefore the bad faith conduct leading to that was irrelevant. When did your client enter into the type two agreement and how? That would be based on the commitment letter that was issued in February of 2008. The Wanamaker letter? The Wanamaker letter, yes. But doesn't your, for a contract, doesn't your client, the other side, have to agree in some way? I mean, if it's a contract type one, type two, or an event type three, I'd assume there's at least two parties to the contract, right? That is correct, Your Honor. When your client became a party, how? Well, our client became a party because NRP is part of the development team. The contract is, the Wanamaker letter is very clear that it was issued to the development team and made three very clear promises, which are the only promises required by the development team. Doesn't your client, if it's a contract, doesn't your client have to accept it? You can make me three promises, and I would be delighted if you did and it was legal. But I would have, for it to become a contract, I would have to say, yeah, I'll sign here, and here's what I'm going to do. And I'm just asking, what turned this into Wanamaker letters? What turned them into a contract that was binding on both sides, even if it be a type two contract? I think the best, and the answer is yes, and the best evidence of that is Mayor Brown's own testimony. His deposition was taken in this case, and he very clearly testified that based on the Wanamaker letter, not only did it create obligations on the city to move forward with the project, but it created obligations on the part of NRP to move forward with the project. It involved the hiring of architects, engineers, going through all the environmental reviews. We are talking about converting. You're saying the acceptance of the contract, I'm not saying it's not so. I'm just trying to figure out what it was. The acceptance of the contract was the actions that your client took in response to the offer of a type two contract. The actions taken are evidence that both sides believed that that letter, that commitment letter, created binding obligations on both sides. You looked at industry practice for affordable housing projects of this type. Those are precisely the types of promises and agreements that bind the municipality and the developer to move forward for each of them to do the things that are necessary. But your adversaries say over and over again that the fruition of this project required council approval and other governmental approvals, and anyone dealing with the municipality knows that you deal at your peril because at the end of the day, the legislature may say, well, we don't like it. No. Your Honor, and that was precisely one of the defenses raised that was addressed by the New York Court of Appeals in the Goodstein construction case. One of the defenses that was raised, and this was a claim against the City of New York based on actions taken by the Housing Preservation Department, and one of the arguments they made because they entered into an alleged agreement that required both sides to move forward to get to the point of having a land development agreement to move forward with an urban renewal project. And one of the arguments that was made apparently to the Court of Appeals because it's prominent in the decision by the Housing and Preservation Department was that only the Board of Estimate was authorized to finally approve the land development agreement and convey the sites. And what the New York Court of Appeals held in that case was that, well, that may affect the damages sought with respect to if the project went to final completion, the profits, for example, that may have been earned. But it does not insulate the city or the Housing Preservation Department from a set of conduct that is in bad faith. And the Court expressly stated that there are damages asserted that involve the costs incurred before the project was killed due to the bad faith conduct. So I'm confused because I've seen New York case law basically saying you can't assert promissory estoppel against municipalities and get money damages. Where there's a contracting process, and as there is here, the charter says that contracts creating municipal liability have to have certain characteristics and be executed in a certain way, that if they're not executed in that way, that's the only source of a potential source of liability. And you can't say, well, they made promises and we made expenditures in reliance on those promises, so compensate us for our reliance. I'm looking at Mann's construction and a number of other relatively recent decisions in New York. Why are those wrong or do they not apply for some reason? Well, I think, Your Honor, I would first try to answer that in one way. I would sort of make the point that there are two contract-based claims in this case. One is based on a Type 2 contract. In the Goodstein construction case, no question about it, was addressing a Type 2 agreement. And in that case, dealing with a Type 2 agreement, the court found that those types of damages are recoverable against the municipality. Raise the question of whether or not your damages can extend to the profits you expected at the end of the day because there was requirements of further approval. Now, promissory estoppel, as Judge Scrutiny found, assumed that the claim for a Type 2 agreement was invalid. You can't have both. Promissory estoppel is a quasi-contract doctrine. It would apply in the absence of a written contract. But we think the principles are fundamentally the same, is that a municipality can't go ahead and make these kinds of promises, go off on a series of actions by the municipality and, more importantly, by the developer. I'm a little confused. Are you saying that this is not a promissory estoppel case? It's a Type 2 contract case because you said it's either or. Didn't you just say it's one or the other? Are you saying it is one, namely a Type 2 contract, and not the other, namely a promissory estoppel because you can't have, as Judge Carney points out, you can't have promissory estoppel against this kind of a defendant? I would say, Your Honor, the pleading was in the alternative. Okay, but the argument now before us is that it's a Type 2 contract. Correct, Your Honor. Our first claim in our complaint was that there was a Type 2 contract. That was dismissed in Judge Scrutiny's first decision on a motion to dismiss. But, again, what made it a contract was that there was a writing making promises, but then you acted in reliance on those promises. That's your form of acceptance. Is that right? I mean, this comes back to Judge Sachs' original question. This doesn't look like a contract. It wasn't executed by your client, and there's no obvious consideration stated on the want-to-make-a-letter. Well, the consideration is based on the testimony in this case that Mayor Brown firmly believed that that letter, speaking directly to that letter, that it did create obligations on the part of NRP to move forward. The question isn't whether he thought so. The question is whether the law says so. Well, I think the law says that in interpreting a contract such as that, you look to industry practice, you look to performance of the parties, and if you look to industry practice and performance of the parties, both parties acted as if that letter, that agreement, imposed obligations on both sides. You can't tell what the obligations are because it describes none with regard to NRP. Well, the obligations are to move forward with all the steps required for affordable housing project, which from that letter, it involved moving forward to get tax credits from the state. It involved all the kinds of planning, environmental reviews, and everything else that needs to happen for that to go forward. You have two minutes for rebuttal. Thank you. Okay, thank you. We'll hear from Mr. Brady for the City of Buffalo. Thank you, Your Honors. Michael Brady on behalf of the Mayor of the City of Buffalo, Mayor Brown, former Councilman Smith, and the city itself. And with me today is my son, Dan, who's also representing the same parties with me, obviously. Judge, the first question is where do I start? And I think I'd like to start on the question about whether, in fact, there was any criminal prosecution that occurred. And if you look at the second amended complaint, which dates back to 2012, six years ago, there is an allegation that the U.S. Attorney's Office or a federal grand jury, I forget exactly how they put it, was looking into this matter. I don't know on what basis that is stated, but we are now nine years after the events we've talked about. And from my memory in a former life as an AUSA, I think we're long past any statute of limitations, so I don't think there's any indication that we're going to have a criminal prosecution here. Secondly, if we did, Judge Sack, I think, asked, would it make any difference? And I think the answer is no, one way or another. Because if legislative immunity applies, the motives underlying the actions can't be looked at. And so in the Blagojevich case with Governor Blagojevich, Empress Casino v. Blagojevich, in the Thillen's case, in the Chappelle case, each of those involved either allegations of bribery or actual admitted bribery, and the courts uniformly held, I think it was the Ninth Circuit, the Eleventh, and the Seventh, universally held, you cannot, under Bogan, look at the motives of the governmental official. What if we were to consider what the proper characterization of his submission of a resolution to the council or failure to submit the resolution to the council was? It seems to me that there's a decent argument that it was really an administrative matter, more like kind of a zoning decision. All of the negotiation, the work, the development of the project, so many different parties involved, all that work had been done. This was just the cap on the development of the project, what he just had to do, and there was evidence, I gathered, that the council never rejected a proposed resolution of this sort. So that makes it sound like an administrative matter. Why was this legislative? I think for two reasons, Judge, and that's kind of the argument that NRP makes, that the common council approval was pro forma. Okay? First of all, it belies the facts. Their person, Mr. Pachoda, who was the only person for NRP who put any testimony into the record with multiple declarations as well as his testimony under the General Obligations Law 50H hearing in advance of the lawsuit, he acknowledged that in May 2009, after these issues arose about what the city supposedly wanted with regard to this project, he came to Buffalo and he met with the common council president, he met with the common council majority leader, and he met with my client, Councilman Smith, to lobby them to support this project and admitted that no guarantees were given. So first of all, it's not pro forma. And secondly, under the law, I think if the court looks at the Yeldell case and this court's opinion in Dorset, I think both would suggest that a decision of an executive whether or not to submit something to a governmental body, such as here the common council, is quintessential legislative activity. And so it's in no way administrative. And Judge Carney, you asked about, isn't the question whether or not Mayor Brown elected to move forward or not by submitting these issues to the council? And that's admitted in this record. We submitted our statement of uncontroversial facts, which said the mayor elected, as he states in his affidavit, not to submit to the council a resolution for the sale of city-owned property, which had to be approved by the council. He elected not to submit to the council the payment in lieu of taxes agreement, which has to be approved by the council as well as the Erie County Legislature. And in response, NRP admitted those are uncontroversial facts. What they added was, but the mayor did that for a wrongful reason. And that's where we get into legislative immunity, that his reason for doing that cannot be looked into. So putting aside the doctrine here, if we were to take all these facts as true and these allegations as true, and I understand they're controverted in part or maybe in whole, what's a developer to do when you need to invest up to a million dollars to do a public housing project and you rely on the good faith of all your partners, the federal and state and so on? Do they just take the risk, that's just a business risk, and if it doesn't come through for some potentially unlawful reason, so it goes? Or do they have any civil remedy? They don't have a remedy, Judge. And it's interesting, if the court looks at the time period of February 2008, the Wanamaker letter that they rely on as their alleged type 2 contract is one letter. It's two pages. It's dated both February 25 and February 26, 2008, for whatever reason. They ignore two contemporary letters from Mr. Wanamaker, a few days before and on February 26, 2008, which set forth varying conditions. But you compare those letters, which are not addressed to NRP. They're addressed to Belmont, the actual developer of the project. Compare those letters, which are not addressed to NRP, which don't ask for a countersignatory, which don't ask for anything out of NRP and set forth no obligations, set forth no limits, never use the word agreement, in which their own person, Mr. Petroda, admitted, this letter of February 25, 2008, from Mr. Wanamaker, the purpose of it was so that we, NRP, could go and try and get tax credits. That was the purpose of the letter. He even testified, I don't know if I would call it a contract. Compare those to the agreements, also contemporary, dated February 21, 2008, within days, between NRP and Belmont, the developer, which are in the record at 1317 and 1342. Those are detailed agreements, which, among other things, put on NRP the obligation to obtain all governmental approvals and address specifically what will happen, what will happen if this project doesn't go forward. And so they recognized that it might not go forward, and they had a defined approach to it. NRP will pay 75% of the upfront costs, and Belmont will kick in 25%. So they come to you and say that a letter on February 25, which is not even addressed to Belmont, was an agreement of the city to move forward on a $12 million project. $12 million isn't even mentioned in here. Neither is NRP's upfront costs. NRP isn't mentioned. And they ignore the fact that in their own agreements, which they show they know how to do an agreement, it's four and five pages long, details their relationship, whether they're partners, whether they're not, who incurs what costs. And it just, the breach of the Type 2 agreement here under the standards of this court and under New York law that says when you have statutory procedures you must follow, the Buffalo City Charter, then promissory estoppel and Type 2 agreements don't make it. Very good. Thank you. Mr. Sullivan. Good morning. My name is Richard Sullivan, and I represent the City of Buffalo Urban Renewal Agency. I must admit that I thought I had my head around my argument this morning and was prepared until I heard the argument of counsel in response to a question from Judge Sack about whether this is a promissory estoppel case or a contract case. And I think he conceded that it's not a promissory estoppel case, and he is relying on the Type 2 contract theory. I think that's what he . . . he said that's what he's focusing on here, but I think he said that they pled in the alternative. And that's the point that I want to make, Judge. The promissory estoppel claim is primarily against me. I don't think they pursued it in their . . . excuse me, the contract claim in their brief against me. It's primarily promissory estoppel. The point I want to make is that this so-called commitment letter is not a commitment letter at all. This is a letter written by another agency of the City of Buffalo. It wasn't written by my client, Bureau. It is written to an entity that is not a party to this action, Belmont. The rights under that letter, and I put rights in quotes, were allegedly later assigned from Belmont to NRP in the assignments in the record, without ever mentioning a potential claim against Bureau. So I don't see how that could possibly be, A, the basis of a contract between NRP and Bureau, and certainly not a promissory estoppel claim for these reasons. We're all familiar. It's in the brief. It's been briefed as to what the elements of promissory estoppel are. Can a promissory estoppel claim be asserted against a municipality? I don't believe so, for the reasons that I think, Judge, that you were concentrating on. But let's concentrate on what is established in the record, and this is clearly a record that was entirely appropriate for summary judgment. Every time someone opposes summary judgment, they say, oh, there's more depositions to be taken and we have to do this and we have to do that. We had years and years of litigation. We've had documents exchanged and we've focused on the key documents to the case, which are apparently this letter in February of 2008. What is undisputed in the record, from my client's point of view, never challenged by the plaintiff, Mr. Billman, the chief counsel to the Urban Renewal Agency, said, okay, there are three statements in that letter. Two of them have absolutely nothing to do with Bureau. Bureau wouldn't be involved in the transfer of the property. Bureau wouldn't be involved in the pilot agreement. That's not what we do. The third one was the provision of funds. Judge Scretany found correctly is entirely contingent on a number of factors that have to happen down the road. So if you are alleging a promissory estoppel claim against us based upon those three representations, the only one undisputed in the record that could possibly apply to Bureau is entirely contingent and you can't have a promissory estoppel claim where there are contingencies. Our fourth department, several years ago, in a case that I happened to argue in the fourth department, in that city of Jamestown case, said exactly the same thing under exactly the same circumstances involving what back then was referred to as a UDAG, Urban Development Action Grant. There is no promissory estoppel claim against Bureau. There's clearly no contract claim against Bureau. And Judge Scretany got it, after three times, got it exactly right as it relates to my client. Thank you. If you don't have any questions, I'll rest on my brief. Thank you. Thank you. Mr. Peril, you have two minutes rebuttal, please. Thank you. There's only one comment by Mr. Sullivan having to do with whether or not the letter was a commitment letter. If this panel reads the commitment letter, it will see that in there, Mr. Wanamaker says, this commitment letter, it's right there in the letter. The reason why Bureau was named as a party in this case was based on the city of Buffalo's argument that the obligations that were created were those of Bureau, not by the city. And so, again, pleading in the alternative, because we do think Bureau was acting in this regard as the agent for the city of Buffalo, we pled claims in the alternative as to the city and Bureau. That's why Bureau was named in this case. I do want to move to the – Let me ask you this. As I read through, studied this record, I was a little bit unsure, but maybe you can help me on this. What is your end game here? Are you seeking a judgment, a money judgment, that will reimburse you for the cost you sunk into trying to get this project done? That's interesting, Your Honor. The Goodstein case says you're entitled to that. In this case, it's $500,000. There was a lot of money spent to get this project from A to Z, which is pretty typical for a project of this type. So certainly they are looking to recover that. If the reason for the activities here were wrongful extortion, if we are able to prove that we are entitled to treble damages under RICO against the individuals, not against the municipality, in the event this court does reinstate the equal protection claim, which we think it should, then, again, we're entitled at a minimum to those damages. Now, the New York Court of Appeals in Goodstein, in analyzing that situation, recognized that the Goodstein construction also asked for the damages or the profits it would have made if the project went to completion. And the court questioned, but did not firmly decide, that under no circumstances are you not entitled to those profits in a situation like this. So we would consider that to be an open issue. But at a minimum, I think we're entitled to the costs that were sunk before this project was killed. Correct. Now, I do want to point out two points quickly on the administrative point which Your Honor had raised. One is I think the test under Rolland is whether or not the conduct singles out a specific individual or is creating general policy that you would expect from legislation. I think there's no question that even if we assume that the only wrongful acts here that should be considered are the failure to introduce the pilot agreement and land transfer, that that was directly focused on a single individual. There was no general policy in play. There's nothing in the record that supports that. To the contrary, there's no question that this would have been an unmitigated good for the city of Buffalo. There is no dispute about that. This is vacant property worth zero. There's a memo in the file that Carla Cosmo created. Typically, that kind of judgment is for the legislature and the elected officials to determine. I mean, your client may believe that, but I have a little difficulty accepting that as a kind of matter of fact. Given, I mean, there are allegations about why the decision was made, but this is a complicated project involving federal and state funding, as well as municipal commitments. You're trying to imply that it was so clearly the right thing to do for Buffalo that your client should be compensated for having committed to it and the project ended up not going forward. Is that right? Am I understanding this right? That's our client's position, Your Honor. We think the evidence that's been generated to date supports that argument. We recognize that the other side takes a different position on that. There's no evidence that's been presented to that effect. We know that the mayor's reasons for killing the project were contrived, that there was no basis for an objection to scattered site or rent to own whatsoever. So we think the facts that have been developed so far, but your point highlights that there's questions of fact that go to that kind of question as to whether or not legislative immunity would apply, for example. And I think the Rollin Court found that there were questions of fact and actually remanded that case for fact-finding to determine whether or not it was substantive or administrative for those reasons as well. I just want one final point, if I may, on the equal protection. And I think it's kind of interesting that the legislative immunity defense is based on legislative acts, and yet the decision to dismiss the equal protection claim was based on authority that administrative decisions at the executive level, such as hiring and firing an employee, are the kinds of acts that we do not want to subject municipalities to equal protection claims. So you can't have it both ways. It's either administrative in one sense altogether, or it's not, and we think it's neither. I would just say on equal protection, I think that we have that there are certainly facts in the record to show that we were treated differently from the developer in Eastside 1 in Packard, and I think that that claim should be reinstated. Thank you very much. Well argued. We'll take the matter under advisement. I think that concludes our calendar today. We have one more matter on for argument, but I don't believe the appellant is here. Is that correct? Would you like to be heard, sir? We have no objection to proceeding without the argument. Taking it on submission? Very good. We'll take the matter on submission. Thank you. We'll take the matter on submission. The clerk will adjourn court.